## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                      **NO.  13-205**

**BYRON JONES, ET AL.**                         **SECTION: "E" (2)**

### ORDER AND REASONS

Before the Court is Defendant Byron Jones's ("Byron") motion for post-verdict judgment of acquittal and a new trial.[1] Byron seeks a judgment of acquittal with respect to Counts 1, 2, 3, 9, and 10 of the Indictment, and a new trial on Counts 5, 6, 7, and 8.[2] The Government opposes Byron's motion.[3] The Court has reviewed the briefs, the record, and the applicable law and now issues its ruling. For the reasons that follow, Byron's motion is **DENIED**.

### BACKGROUND

On August 17, 2015, this criminal matter proceeded to a trial by jury with respect to Defendants Deloyd Jones, Sidney Patterson, and Byron.[4] After a trial which lasted approximately a week-and-a-half, the jury returned verdicts on August 28, 2015, on all counts against the aforementioned Defendants. Of present importance, the jury found Byron guilty on all of the charges which were then-pending against him.[5]

---

[1] R. Doc. 540.

[2] R. Doc. 540 at 1.

[3] R. Doc. 642.

[4] The September 19, 2013 Indictment also named as Defendants the following persons—Tre Clements, Ervin Spooner, Romalis Parker, Nyson Jones, Andrealie Lewis, Morris Summers, Tyone Burton, Tyrone Burton, and Perry Wilson. Those Defendants pleaded guilty to certain counts of the Indictment on the eve of trial.

[5] However, in addressing certain special-findings questions for sentencing-enhancement purposes, the jury did not unanimously find that Defendant Byron Jones, himself, committed the February 24, 2010 murder of Travis Arnold in violation of Louisiana law. *See* R. Doc. 536-5 at 3 (Jury Verdict Form). The jury did unanimously find that Byron Jones, as a result of his own direct conduct and/or the reasonably foreseeable

On September 11, 2015, Byron filed the instant motion for (1) a post-verdict judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure as to Counts 1, 2, 3, 9, and 10, and (2) a motion for new trial with respect to Counts 5, 6, 7, and 8 under Rule 33. Byron contends that, with respect to Counts 1, 2, 3, 9, and 10, the guilty verdicts against him on those counts "are not supported by the evidence adduced during the six days of testimony and the admitted exhibits."[6] As for Counts 5, 6, 7, and 8, Byron moves for a new trial, arguing the Court committed error by "not instructing the jury on the definition of accessory after the fact under Louisiana law."[7]

## **LAW AND ANALYSIS**

I. POST-VERDICT JUDGMENT OF ACQUITTAL ON COUNTS 1, 2, & 3 – THE CONSPIRACY COUNTS

Counts 1, 2, and 3 charged Byron with conspiracy offenses. Specifically, Count 1 charged Byron with a RICO conspiracy offense, in violation of 18 U.S.C. § 1962(d); Count 2 charged Byron with conspiracy to distribute and possess with the intent to distribute crack cocaine, heroin, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and Count 3 charged Byron with conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o).[8]

Byron argues, with respect to Count 1, that the Government failed to prove the existence of an association-in-fact enterprise, which is a necessary element of a RICO conspiracy.[9] According to Byron, "[t]here simply was not sufficient evidence admitted at the trial to establish beyond a reasonable doubt that Byron Jones was a member of a group

conduct of his co-conspirators in furtherance of the conspiracy as a whole, conspired to distribute and possess with the intent to distribute 280 grams or more of cocaine base.
[6] R. Doc. 540-1 at 2.
[7] R. Doc. 540-1 at 7.
[8] *See generally* R. Doc. 1; R. Doc. 538 (Final Jury Instructions).
[9] R. Doc. 540-1 at 5.

of associates who functioned as a continuing unit striving for a shared purpose."[10] For that reason, Byron argues he should be acquitted on Count 1 post-trial under Rule 29.

Byron also challenges his convictions on Counts 2 and 3, but unlike Count 1, it is unclear from Byron's motion what his specific arguments are with respect to Counts 2 and 3. In his motion, Byron seems to argue that, because the Government failed to prove the existence of an association-in-fact enterprise, which is an element of the crime charged in Count 1, his convictions on Counts 2 and 3 also should not stand.[11] However, the existence of an association-in-fact enterprise is not a required element of the drug and gun conspiracies charged in Counts 2 and 3.[12] The Government argues, and the Court agrees, that Byron has failed to "provide any additional legal or factual argument to support his request that the Court invalidate the jury's verdict as to the gun and drug conspiracies."[13] The Fifth Circuit has consistently held that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver of the issue on appeal.[14] "By analogy, failure to brief an argument in the district court waives that argument in that court."[15] Because Byron failed to brief his arguments with respect to Counts 2 and 3, the Court considers only Byron's arguments with respect to Count 1 and whether he is entitled to a judgment of acquittal on Count 1 under Rule 29.

---

[10] R. Doc. 540-1 at 5.

[11] R. Doc. 540-1 at 4–5.

[12] *See* R. Doc. 538 at 61–64 (Final Jury Instructions). Count 2 charged Byron with violations of 21 U.S.C. §§ 841(a)(1) and 846, and Count 3 charged violations of 18 U.S.C. § 924(o). It was not necessary to prove the existence of an association-in-fact enterprise for Byron to be found guilty of violating those statutes.

[13] R. Doc. 642 at 3.

[14] *See, e.g., Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 747 n.16 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001)); *Johnson v. Puckett*, 176 F.3d 809, 814 (5th Cir. 1999).

[15] *McZeal v. J.P. Morgan Chase Bank, NA*, No. 13-6754, 2014 WL 3166715, at *8 n.23 (E.D. La. July 7, 2014) (citing *Williamson v. Watco Companies, Inc.*, No. 09-1255, 2010 WL 4117745, at *3 (W.D. La. Oct. 13, 2010)). *See also Magee v. Life Ins. Co. of N.A.*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003). For the same principle in the context of a criminal matter, see *Mitchell v. United States*, No. 4:10CR00057-026, 2015 WL 1738218, at *8 (E.D. Tex. Apr. 9, 2015) ("By failing to adequately brief these issues, Mitchell waived them.") (citing *Summers v. Dretke*, 431 F.3d 861, 870 (5th Cir. 2003)).

A.  Legal Standard

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "is a challenge to the sufficiency of the evidence to sustain a conviction."[16] When considering the sufficiency of the evidence, the court must determine whether "a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt."[17] The court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[18] "[I]f the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld."[19] "All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor."[20]

B.  Law & Analysis

In *Boyle v. United States*, the United States Supreme Court affirmed that, in order to prove the existence of a RICO conspiracy, the Government must prove the existence of an "association-in-fact enterprise."[21] The Supreme Court held, in the context of a RICO conspiracy, "it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise,

---

[16] *United States v. Brown*, No. 2:10-CR-00291, 2012 WL 273163, at *2 (W.D. La. Jan. 26, 2012) (citing *United States v. Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007)). "A Rule 29 motion for acquittal tests only the sufficiency of the evidence introduced at trial to support the crime charged." *United States v. Age*, No. 11-105-JJB, 2013 WL 3245215, at *1 (M.D. La. June 26, 2013).

[17] *United States v. Miles*, 360 F.3d 472, 476 (5th Cir. 2004). *See also United States v. Age*, 2013 WL 3245215, at *1.

[18] *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995) (citations omitted).

[19] *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005). *See also United States v. Mack*, No. 15-61-SDD-SCR, 2016 WL 740280, at *1 (M.D. La. Feb. 24, 2016). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995).

[20] *United States v. Burns*, 597 F.2d 939, 940–41 (5th Cir. 1979) (citations omitted).

[21] *Boyle v. United States*, 556 U.S. 938, 945 (2009).

and longevity sufficient to permit these associates to pursue the enterprise's purpose."[22] The *Boyle* Court made clear that the term "enterprise" is defined broadly, noting that "the very concept of an association in fact is expansive."[23] "In addition, the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes."[24]

In the present motion, Byron contends the Government failed to prove the existence of an association-in-fact enterprise and, as a result, that his conviction on Count 1 cannot stand.[25] The Government disagrees and, in opposing Byron's motion, points to the evidence and testimony offered at trial to prove the existence of an association-in-fact enterprise—*i.e.*, in this case, the "Ride or Die" gang ("ROD").[26]

Perry Hall, a resident of the Eighth Ward neighborhood in which ROD operated, testified for the Government and explained that ROD members regularly packaged and sold drugs from his Mandeville Street home.[27] Hall testified, specifically, that he knew these individuals to be members of ROD.[28] Hall further testified that, on various occasions, "16" or "17" ROD members gathered at his home to cut, package, and prepare-for-sale illegal narcotics.[29] According to Hall, ROD members "stashed" drugs and guns in his Mandeville Street residence and frequented the residence on a daily basis to sell those drugs.[30] Hall even testified that, on at least one occasion, ROD members "put the[ir] money together" to purchase crack cocaine for resale in the Eighth Ward.[31]

---

[22] *Id.* at 946.
[23] *Id.* at 944.
[24] *Id.* (internal citations and quotation marks omitted).
[25] R. Doc. 540-1 at 5.
[26] R. Doc. 642 at 3–6.
[27] R. Doc. 662 at 49 (Trial Transcript, Day 2, p. 243).
[28] R. Doc. 662 at 50 (Trial Transcript, Day 2, p. 244).
[29] R. Doc. 662 at 49–50 (Trial Transcript, Day 2, p. 243–44).
[30] R. Doc. 662 at 52–55 (Trial Transcript, Day 2, p. 246–49).
[31] R. Doc. 662 at 56 (Trial Transcript, Day 2, p. 250).

Also testifying for the Government were several police officers with the New Orleans Police Department ("NOPD"). For example, Officer Travis Brooks, a former NOPD narcotics detective, offered testimony with respect to undercover narcotics operations which the NOPD conducted at Perry Hall's Mandeville Street residence.[32] According to Officer Brooks, Hall's residence was targeted because officers had "observed hand-to-hand drug transactions" taking place within and around the residence.[33] Officer Brooks testified that, as a result, he supervised a "controlled purchase" of narcotics from Hall's residence.[34] Officer Brooks further testified that, after conducting the controlled purchase, he obtained a search warrant for the residence.[35] Officer Brooks explained that, during the execution of the search warrant, two semi-automatic firearms with extended magazines were found hidden in a toilet bowl.[36] Present in Hall's residence during the execution of the search warrant were known members of the ROD gang.[37] Officer Willard Pearson also testified for the Government.[38] During his testimony, Officer Pearson—a veteran officer in the NOPD's Fifth District, which encompassed ROD territory—expressed a familiarity with Perry Hall's residence located at 1632 Mandeville Street.[39] Officer Pearson testified that "several narcotics arrests" had been made at that location, and that Hall's residence was known for "cooking and storing crack cocaine and other narcotics, and also weapons."[40]

---

[32] R. Doc. 664 at 230 (Trial Transcript, Day 4, p. 918).
[33] R. Doc. 664 at 233 (Trial Transcript, Day 4, p. 921).
[34] R. Doc. 664 at 230–31 (Trial Transcript, Day 4, p. 918–19). Officer Brooks explained that a "controlled purchase" occurs when the NOPD supplies funds to a confidential informant to purchase illegal substances, the success of which is then used to obtain a search warrant for a particular place or thing. R. Doc. 664 at 230–31 (Trial Transcript, Day 4, p. 918–19).
[35] R. Doc. 664 at 234 (Trial Transcript, Day 4, p. 922).
[36] R. Doc. 664 at 236–40 (Trial Transcript, Day 4, p. 924–28).
[37] R. Doc. 664 at 242 (Trial Transcript, Day 4, p. 930).
[38] R. Doc. 665 at 15 (Trial Transcript, Day 5, p. 953).
[39] R. Doc. 665 at 20 (Trial Transcript, Day 5, p. 958).
[40] R. Doc. 665 at 20–21 (Trial Transcript, Day 5, p. 958–59).

The Government also presented testimony from several former ROD members and associates. Erick Garrison testified that he was a founding member of the ROD gang and that Byron, among others, was also an ROD member.[41] Garrison testified that ROD members sold crack cocaine "every day" near the intersection of Mandeville Street and N. Derbigny Street and the intersection of Port Street and Urquhart Street in the Eighth Ward.[42] Garrison also testified that ROD members used Perry Hall's Mandeville Street residence to "chop down and bag up cocaine."[43] Moreover, according to Garrison, only members of ROD were able to sell drugs in those locations, as the Eighth Ward was ROD territory.[44] Throughout his testimony, Garrison conveyed an intimate knowledge of illegal drugs and the drug trade and explained that he, personally, had witnessed other ROD members sell drugs on numerous occasions.[45] Garrison also confirmed that ROD members regularly carried firearms.[46] Garrison specifically stated, when referring to the male members of ROD, that: "I seen all of us with a gun before."[47] Garrison testified that ROD members would stash guns under houses, in the grass, or in gutters and that the guns could be used by any ROD member for "protection" when selling drugs.[48]

Andrealie Lewis, also a former ROD member, offered similar testimony.[49] As did Garrison, Lewis identified Byron as a member of the ROD gang.[50] During her testimony, Lewis evinced her knowledge of ROD, explaining that she (1) understood the meaning of

---

[41] R. Doc. 667 at 18–21 (Trial Transcript, Day 7, p. 1384–87).
[42] R. Doc. 667 at 39–40 (Trial Transcript, Day 7, p. 1405–06).
[43] R. Doc. 667 at 39–40 (Trial Transcript, Day 7, p. 1405–06).
[44] R. Doc. 667 at 40 (Trial Transcript, Day 7, p. 1406).
[45] R. Doc. 667 at 37–39, 42–44 (Trial Transcript, Day 7, p. 1403–05, 1408–10).
[46] R. Doc. 667 at 44–45 (Trial Transcript, Day 7, p. 1410–11).
[47] R. Doc. 667 at 45 (Trial Transcript, Day 7, p. 1411).
[48] R. Doc. 667 at 45 (Trial Transcript, Day 7, p. 1411). Garrison explained that the guns were used to protect ROD members from people that were "addicted to drugs that may come around and try to jack, anything like that." R. Doc. 667 at 45 (Trial Transcript, Day 7, p. 1411).
[49] See R. Doc. 666 at 81 (Trial Transcript, Day 6, p. 1156).
[50] R. Doc. 666 at 84 (Trial Transcript, Day 6, p. 1159).

ROD, (2) personally knew the members of ROD, (3) was familiar with the various "slang" terms which ROD members used to communicate in code, and (4) knew the boundaries of ROD's territory.[51] Lewis also confirmed that ROD members "hustled" drugs out of Perry Hall's house on Mandeville Street in the Eighth Ward.[52] Moreover, Lewis testified that "everybody" who belonged to ROD sold illegal drugs, and that she saw ROD members selling drugs on a "daily basis."[53] Lewis also testified that several members of ROD, including Byron, illegally carried firearms.[54]

In a similar fashion, former ROD member Aaron Rudolph testified on behalf of the Government.[55] Rudolph confirmed that ROD referred to a specific group of people and that Byron was a member of that group.[56] Rudolph also testified that he had been present in the past when ROD members sold drugs and possessed guns.[57] Furthermore, Rudolph explained that only members of ROD could sell drugs within ROD territory, and specifically on Mandeville Street in the Eighth Ward.[58] Rudolph also testified that, when selling drugs in that area, ROD members did not stray "far apart" but, instead, remained close in order to "keep up with everybody."[59] When asked why it was important to "keep up with where the other members of ROD were," Rudolph answered: "So you can know if something happening. Like, you can have a good general idea of who did it."[60] Rudolph explained that "something happening" referred to someone getting shot.[61] To that end,

---

[51] R. Doc. 666 at 83 (Trial Transcript, Day 6, p. 1158). *See also* R. Doc. 666 at 84–92 (Trial Transcript, Day 6, p. 1159–67).
[52] R. Doc. 666 at 83–84 (Trial Transcript, Day 6, p. 1158–59).
[53] R. Doc. 666 at 97–98 (Trial Transcript, Day 6, p. 1172–73).
[54] R. Doc. 666 at 99 (Trial Transcript, Day 6, p. 1174).
[55] R. Doc. 665 at 105 (Trial Transcript, Day 5, p. 1043).
[56] R. Doc. 665 at 108–09 (Trial Transcript, Day 5, p. 1046–47).
[57] R. Doc. 665 at 108 (Trial Transcript, Day 5, p. 1046).
[58] R. Doc. 665 at 112 (Trial Transcript, Day 5, p. 1050).
[59] R. Doc. 665 at 113 (Trial Transcript, Day 5, p. 1051).
[60] R. Doc. 665 at 113 (Trial Transcript, Day 5, p. 1051).
[61] R. Doc. 665 at 113 (Trial Transcript, Day 5, p. 1051).

Rudolph testified that, for protection, ROD members stored firearms throughout the Eighth Ward, stating that "anywhere you went there was a gun around."[62] And, according to Rudolph, "anybody from ROD" could use those firearms at any time to protect themselves and their drugs.[63]

The Government also offered the testimony of residents of New Orleans who were familiar with ROD. For example, Darryl Arnold, a resident of the Eighth Ward, testified that he knew of and was familiar with ROD, explaining that ROD was a "gang" that operated in the St. Roch neighborhood of the Eighth Ward.[64] Arnold identified Byron as a member of ROD.[65] Jimmy Joseph also testified for the Government, stating that he too was familiar with ROD.[66] Joseph testified that ROD was "a crew of guys" in the Eighth Ward who "got in trouble."[67] Like Arnold, Joseph identified Byron as an ROD member.[68] Furthermore, Joseph testified that he often, if not always, purchased his crack cocaine from the various members of ROD.[69] Joseph also testified to the fact that he had personally seen Byron, along with other ROD members, carry firearms in the past, including AK-47 rifles.[70]

In the context of a Rule 29 motion for judgment of acquittal, the Court must view all evidence and testimony in the light most favorable to the Government.[71] The Court is not tasked with assessing whether the jury's verdict is correct but, instead, whether the verdict is rational, in light of the evidence presented at trial. Guided by those standards,

---

[62] R. Doc. 665 at 113 (Trial Transcript, Day 5, p. 1051).
[63] R. Doc. 665 at 114 (Trial Transcript, Day 5, p. 1052).
[64] R. Doc. 662 at 203–04 (Trial Transcript, Day 2, p. 397–98).
[65] R. Doc. 662 at 204–05 (Trial Transcript, Day 2, p. 398–99).
[66] R. Doc. 665 at 55–56 (Trial Transcript, Day 5, p. 993–94).
[67] R. Doc. 665 at 56 (Trial Transcript, Day 5, p. 994).
[68] R. Doc. 665 at 60–61 (Trial Transcript, Day 5, p. 998–99).
[69] R. Doc. 665 at 62 (Trial Transcript, Day 5, p. 1000).
[70] R. Doc. 665 at 62–65 (Trial Transcript, Day 5, p. 1000–03).
[71] *See United States v. Miles*, 360 F.3d 472, 476 (5th Cir. 2004).

the Court finds that a rational trier of fact could have found that the testimony and evidence presented by the Government, which is highlighted in part above, established the existence of an association-in-fact enterprise beyond a reasonable doubt. As a result, the Court finds no basis upon which to grant Byron's Rule 29 motion for post-verdict judgment of acquittal with respect to Count 1.

II.   POST-VERDICT JUDGMENT OF ACQUITTAL ON COUNTS 9 & 10 – THE SHOOTING OF ERNEST AUGUSTINE

Byron also seeks a judgment of acquittal on Counts 9 and 10 under Federal Rule of Criminal Procedure 29. The Court incorporates the Rule 29 standard, which is set forth above, as if copied herein *in extenso*. Byron was charged in Counts 9 and 10 with certain crimes stemming from the shooting of Ernest Augustine on April 29, 2010. Specifically, Count 9 charged Byron with assault with a dangerous weapon in violation of the laws of the State of Louisiana—that is, Title 14, Louisiana Revised Statutes, Sections 37 and 24— all in violation of 18 U.S.C. §§ 1959(a)(3) and 2. Count 10 charged Byron with use of a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Byron challenges his convictions on Counts 9 and 10 on two grounds.[72] First, Byron argues the Government was required, but failed, to prove beyond a reasonable doubt that he was the shooter of Ernest Augustine on April 29, 2010.[73] Second, Byron contends that, even if the Government adequately identified him as the shooter, the Government nevertheless failed to prove beyond a reasonable doubt, as required, that "the shooting of Ernest Augustine was motivated by drug dealing or a racketeering

---

[72] *See generally* R. Docs. 540-1, 649.
[73] R. Doc. 540-1 at 5–7.

enterprise."[74] The Court addresses each of these challenges to Byron's convictions on Counts 9 and 10, in turn, below.

    A.  <u>Identification of Byron as Ernest Augustine's Shooter</u>

Byron correctly notes that, in addition to proving the essential elements of each crime, the Government must also prove "the identity of the defendant as the perpetrator of the alleged offenses."[75] Byron contends the Government failed to meet this burden with respect to Counts 9 and 10, as the Government did not, beyond a reasonable doubt, identify Byron as the perpetrator who shot Ernest Augustine on April 29, 2010.[76] At trial, the Government offered the testimony of two witnesses to prove that Byron was the person who shot Ernest Augustine.[77] However, Byron argues that the testimony of each of those witnesses was contradicted by other evidence, such that the jury's reliance on the testimony of those witnesses amounted to a "miscarriage of justice."[78]

    *1.  <u>Testimony of Terrance Paul</u>*

First, the Government offered the testimony of Terrance Paul, an eyewitness to the shooting, who testified over two days on August 19 and 20, 2015.[79] During his testimony, Paul identified Byron as Ernest Augustine's shooter.[80] Paul testified that, on April 29, 2010—the day of the shooting—he was smoking a cigarette on the porch of his mother's house, which was located on the Eighth Ward corner of N. Galvez Street and Piety Street across from the Magnolia Super Market where the shooting occurred.[81] Paul testified that,

---

[74] R. Doc. 649 at 15.
[75] R. Doc. 540-1 at 5. *See also* R. Doc. 538 at 23 (Final Jury Instructions).
[76] R. Doc. 540-1 at 5–6.
[77] The Government called Terrance Paul and Jamal Holmes as witnesses. Both Paul and Holmes testified, in different ways, that Byron was the person who shot Ernest Augustine on April 29, 2010.
[78] R. Doc. 540-1 at 6–7.
[79] R. Doc. 663 at 250 (Trial Transcript, Day 3, p. 659). *See also* R. Doc. 664 at 20 (Trial Transcript, Day 4, p. 708).
[80] R. Doc. 663 at 255 (Trial Transcript, Day 3, p. 664).
[81] R. Doc. 663 at 253–54 (Trial Transcript, Day 3, p. 662–63).

while on the porch, he observed Byron approach Ernest Augustine's Cadillac SUV which was parked in the Magnolia Super Market's parking lot, "pull out a gun," and start "shooting at the car" while Augustine sat in the driver's seat.[82]

Byron contends, however, that Paul's testimony was "flatly at odds with the physical evidence retrieved from the scene of the Augustine shooting."[83] On cross-examination, Byron's attorney asked Paul to indicate, by placing a mark on a photograph of the scene taken shortly after the shooting, where the shooter was standing when he fired into the vehicle.[84] Paul indicated that the shooter was standing in close proximity to Augustine's vehicle, no more than "a few feet" away.[85] However, Byron argues the marking that Paul made on the photograph of the scene was "a significant distance from where the casings were marked by NOPD crime scene technicians."[86] Thus, according to Byron, Paul's testimony cannot be reconciled with the "physical evidence."[87] The Government disagrees, noting that at trial "there was no evidence as to the distance between Mr. Paul's marking on the photograph at trial and the cones that marked the location of the shell casings; there was no evidence as to the make and model of gun used by Mr. Jones to shoot Mr. Augustine; and finally, there was no evidence regarding whether it was possible for casings to travel the distance described."[88]

### 2. *Testimony of Jamal Holmes*

Second, the Government offered the testimony of Jamal Holmes, an individual who was allegedly incarcerated with Byron for a period of time at the Nelson Coleman

---

[82] R. Doc. 663 at 254 (Trial Transcript, Day 3, p. 663).
[83] R. Doc. 540-1 at 6.
[84] R. Doc. 664 at 23 (Trial Transcript, Day 4, p. 711).
[85] R. Doc. 664 at 24 (Trial Transcript, Day 4, p. 712).
[86] R. Doc. 649 at 19.
[87] R. Doc. 540-1 at 6; R. Doc. 649 at 18–19.
[88] R. Doc. 642 at 7.

Correctional Center in St. Charles Parish.[89] Holmes testified that, while he and Byron were incarcerated together in either August or September of 2014, Byron admitted to shooting Ernest Augustine.[90] Specifically, testifying under the co-conspirator exception to the rule against hearsay, Holmes quoted Byron as saying: "Y'all think Puggy be doing everything, but I did that to Elo by myself. I handled that by myself."[91]

Again, however, Byron attacks Holmes's testimony and the jury's reliance thereupon, contending "jail records were admitted showing Byron Jones was in a different facility at the time the alleged statement was made."[92] The Government notes, in response, that Holmes later recanted his testimony that Byron made the statement in August or September 2014, explaining that he could not recall the exact date on which the statement was made but clearly remembered the statement being made and the contents of the statement.[93] Byron also argues that at no point during trial did the Government elicit testimony that "Elo" was Ernest Augustine's nickname or alias.[94] As with Terrance Paul's testimony, Byron argues the testimony of Jamal Holmes does not support the jury's verdicts on Counts 9 and 10.

### 3. *Other Evidence*

Byron also emphasizes the testimony of Officer Valencia Pedescleaux in an attempt to establish that his convictions on Counts 9 and 10 are not supported by the evidence introduced at trial.[95] Officer Pedescleaux, a detective in the NOPD's Fifth District at the time, was one of the first officers to respond to the scene of Ernest Augustine's shooting

---

[89] R. Doc. 666 at 235 (Trial Transcript, Day 6, p. 1310).
[90] R. Doc. 666 at 239 (Trial Transcript, Day 6, p. 1314).
[91] R. Doc. 666 at 239 (Trial Transcript, Day 6, p. 1314).
[92] R. Doc. 540-1 at 6.
[93] R. Doc. 642 at 7. *See also* R. Doc. 666 at 270–71 (Trial Transcript, Day 6, p. 1345–46).
[94] R. Doc. 540-1 at 6.
[95] R. Doc. 540-1 at 6. *See also* R. Doc. 649 at 15–17.

on April 29, 2010.[96] Officer Pedescleaux testified that, after Augustine was placed into an ambulance, she asked Augustine to describe the shooter.[97] Officer Pedescleaux testified that Augustine described the shooter as "a black male with a brown complexion wearing a black baseball cap, a black t-shirt, black pants, and black boots."[98] According to Officer Pedescleaux, Augustine further described the shooter as having a "slender build."[99] Byron argues, however, that Officer Pedescleaux's testimony does not support a finding that he was the shooter. According to Byron, "[a]ll evidence as to Byron Jones's physical stature proves that he did not come within 50-75 pounds of slender at all pertinent times."[100] Thus, Byron implies that, in light of Officer Pedescleaux's testimony, it was impossible for the jury to conclude that he was the person who shot Ernest Augustine. In response, the Government points to the testimony of Ernest Augustine himself.[101] Contrary to Officer Pedescleaux's testimony, Augustine testified that he did not see who shot him, nor did he recall ever providing a description of the shooter to the police at any time thereafter.[102]

### 4. *Analysis*

As explained above, when considering a Rule 29 motion, the Court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[103] Moreover, "if the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld."[104] In

---

[96] R. Doc. 663 at 225 (Trial Transcript, Day 3, p. 634).
[97] R. Doc. 663 at 227–28 (Trial Transcript, Day 3, p. 636–37).
[98] R. Doc. 663 at 228 (Trial Transcript, Day 3, p. 637).
[99] R. Doc. 663 at 228 (Trial Transcript, Day 3, p. 637).
[100] R. Doc. 540-1 at 6.
[101] R. Doc. 663 at 222 (Trial Transcript, Day 3, p. 631).
[102] R. Doc. 663 at 222 (Trial Transcript, Day 3, p. 631).
[103] *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995) (citations omitted).
[104] *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005). *See also United States v. Mack*, No. 15-61-SDD-SCR, 2016 WL 740280, at *1 (M.D. La. Feb. 24, 2016). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and

assessing the sufficiency of the evidence and the testimony presented at trial, "[i]t is the sole province of the jury, and not within the power of this Court, to weigh conflicting evidence and evaluate the credibility of witnesses."[105] Byron's motion for a judgment of acquittal on Counts 9 and 10 is based entirely on the jury's interpretation of conflicting evidence.[106] The testimony of Terrance Paul, Jamal Holmes, and Officer Valencia Pedescleaux may conflict with other evidence and witness testimony presented at trial to some extent, as Byron highlights in his motion. Nevertheless, it is not within the province of this Court to weigh conflicting evidence and assess whether the jury's verdict was correct. The Court, instead, must determine whether the jury's decision was rational, given that conflicting evidence was presented at trial. In this case, viewing the evidence and testimony as a whole in the light most favorable to the Government, the Court finds that the jury rationally concluded that Byron was identified beyond a reasonable doubt as the individual who shot Ernest Augustine on April 29, 2010.

### B.  Motivated by Drug Dealing or Racketeering Enterprise

Byron raises an additional challenge to his convictions on Counts 9 and 10 on the grounds that, even if he was identified as the shooter, the Government failed to prove beyond a reasonable doubt that "the shooting of Ernest Augustine was in furtherance of racketeering activity and as part of a drug trafficking offense."[107] Byron raised this argument for the first time in his reply brief to the Government's opposition.[108] The

---

the jury is free to choose among reasonable constructions of the evidence." *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995).

[105] *United States v. Millsaps*, 157 F.3d 989, 994 (5th Cir. 1998) (quoting *United States v. Ivey*, 949 F.2d 759, 767 (5th Cir. 1991), *cert. denied*, *Wallace v. United States*, 506 U.S. 819 (1992)) (internal quotation marks omitted).

[106] *See* R. Doc. 540-1 at 5–7.

[107] R. Doc. 649 at 2.

[108] *See* R. Doc. 649 at 15–17.

argument was not raised in Byron's original motion, and it was consequently not addressed in the Government's opposition to Byron's motion.[109] The Fifth Circuit and the courts within it have held that "[a]rguments raised for the first time in a reply brief are generally waived."[110] For that reason, the Court need not consider Byron's argument that the Government failed to prove Byron shot Ernest Augustine in furtherance of a racketeering enterprise or drug trafficking activity.

The Court, in its discretion, will nevertheless address the argument. With respect to Count 9, the Government was required to prove that the crime charged, *i.e.*, assault with a dangerous weapon, was committed "for the purpose of gaining entrance to and maintaining and increasing position in R.O.D., an enterprise engaged in racketeering activity."[111] As to Count 10, the Government was required to prove that the charged crime was committed during and in relation to a crime of violence or a drug trafficking crime.[112] According to Byron, "[n]ot one witness, phone call recording[,] or piece of tangible evidence in any way supports the argument that the shooting of Ernest Augustine was motivated by drug dealing or a racketeering enterprise."[113] After reviewing the record in this matter and the plethora of evidence submitted to establish that Byron was a member of ROD and participated in its many illegal endeavors, the Court must disagree with

---

[109] *See generally* R. Docs. 540-1, 642.

[110] *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) (citing *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005); *Iteld, Bernstein & Assocs., LLC v. Hanover Ins. Group*, No. 06-3418, 2009 WL 2496552, at *4 (E.D. La. Aug. 12, 2009) ("[A]rguments raised for the first time in a Reply brief are waived.")). *See also United States v. Dukes*, 35 F.3d 559 (5th Cir. 1994) (per curiam) (citing *United States v. Prince*, 868 F.2d 1379, 1386 (5th Cir.), *cert. denied*, 493 U.S. 932 (1989)) ("We do not address issues raised for the first time in a reply brief."); *Gotch v. UPS Ground Freight, Inc.*, No. H-13-375, 2014 WL 4071573, at *1 (S.D. Tex. July 25, 2014); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 795, 811 (E.D. Tex. 2014) (citations omitted) ("Failure to raise an argument in a motion waives the argument; raising it for the first time in a reply memorandum is too late.").

[111] R. Doc. 538 at 79 (Final Jury Instructions).

[112] R. Doc. 538 at 97 (Final Jury Instructions).

[113] R. Doc. 649 at 15.

Byron. The Government submitted sufficient and substantial evidence from which the jury could reasonably infer (1) that Byron shot Ernest Augustine for purposes of maintaining and increasing position within ROD, and (2) that the shooting was committed in furtherance of a crime of violence or a drug trafficking crime.

The jury was instructed that, with respect to Count 9, it needed only to conclude that Byron "committed the charged crime as an integral aspect of membership in the enterprise." [114] Courts have held that this requirement is satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." [115] Similarly, with respect to Count 10, the jury was instructed that it needed to find Byron possessed the firearm used to shoot Ernest Augustine in furtherance of the RICO conspiracy charged in Count 1 or the drug conspiracy charged in Count 2.

The evidence submitted at the trial of this matter established, beyond a reasonable doubt, that Byron was a member of ROD, a violent street gang which operated in the Eighth Ward of New Orleans. [116] Several witnesses also testified that one of ROD's principal goals was to sell drugs and to protect those drugs and other ROD members

---

[114] *See* R. Doc. 538 at 77 (Final Jury Instructions).

[115] *See, e.g., United States v. Kamahele*, 748 F.3d 984, 1012 (10th Cir. 2014) (quoting *United States v. Smith*, 413 F.3d 1253, 1278 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009)); *United States v. Robertson*, 736 F.3d 1317, 1329–30 (11th Cir. 2013) (citations omitted); *United States v. Banks*, 514 F.3d 959, 965 (9th Cir. 2008); *United States v. Jones*, 291 F. Supp. 2d 78, 86 (D. Conn. 2003) (citations omitted); *United States v. Soler*, No. 94-CR-533, 1998 WL 167327, at *2 (S.D.N.Y. Apr. 9, 1998) (quoting *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994)); *see also United States v. Norwood*, No. 12-CR-20287, 2015 WL 2250493, at *17 (E.D. Mich. May 13, 2015).

[116] *See* R. Doc. 662 at 49–50 (Testimony of Perry Hall) (Trial Transcript, Day 2, p. 243–44); R. Doc. 662 at 204–05 (Testimony of Darryl Arnold) (Trial Transcript, Day 2, p. 398–99); R. Doc. 664 at 230 (Testimony of Officer Travis Brooks) (Trial Transcript, Day 4, p. 918); R. Doc. 665 at 20–21 (Testimony of Officer Willard Pearson) (Trial Transcript, Day 5, p. 958–59); R. Doc. 665 at 60–61 (Testimony of Jimmy Joseph) (Trial Transcript, Day 5, p. 998–99); R. Doc. 665 at 108–09 (Testimony of Aaron Rudolph) (Trial Transcript, Day 5, p. 1046–47); R. Doc. 666 at 84 (Testimony of Andrealie Lewis) (Trial Transcript, Day 6, p. 1159); R. Doc. 667 at 18–21 (Testimony of Erick Garrison) (Trial Transcript, Day 7, p. 1384–87).

through the use of an arsenal of weapons, which ROD members stashed in various locations within ROD's Eighth Ward territory for quick and easy access.[117] Witnesses also testified to the fact that Byron, himself, sold drugs and illegally possessed weapons in connection with that drug activity on different occasions.[118] Moreover, as detailed above, Jamal Holmes testified about a conversation he had with Byron while the two were incarcerated together in St. Charles Parish.[119] During that conversation, Byron allegedly bragged to Holmes about shooting Ernest Augustine, stating: "Y'all think Puggy be doing everything, but I did that to Elo by myself. I handled that by myself."[120] Puggy was identified at trial as Deloyd Jones, another ROD member.[121] Therefore, Holmes's testimony established that, not only did Byron commit the shooting, he thereafter bragged about doing so to show that he, and not only "Puggy," was capable of committing such crimes. This supports an inference that Byron's act of shooting Ernest Augustine, and his subsequent boasting, was done at least in part to advance his status in the ROD enterprise. In sum, the Court finds the jury had before it sufficient evidence to conclude that Byron shot Ernest Augustine in furtherance of a RICO enterprise.

III.  NEW TRIAL ON COUNTS 5, 6, 7, & 8 – THE MURDER OF TRAVIS ARNOLD & THE SHOOTING OF ISAAC ROWEL

Byron seeks a new trial on Counts 5, 6, 7, and 8 under Federal Rule of Criminal Procedure 33. Byron was charged in Counts 5, 6, 7, and 8 with certain crimes stemming

---

[117] *See, e.g.,* R. Doc. 662 at 52–55 (Testimony of Perry Hall) (Trial Transcript, Day 2, p. 246–49); R. Doc. 665 at 113 (Testimony of Aaron Rudolph) (Trial Transcript, Day 5, p. 1051); R. Doc. 666 at 83–84, 97–98 (Testimony of Andrealie Lewis) (Trial Transcript, Day 6, p. 1158–59, 1172–73); R. Doc. 667 at 37–39, 42–45 (Testimony of Erick Garrison) (Trial Transcript, Day 7, p. 1403–05, 1408–11).

[118] *See* R. Doc. 665 at 62–65 (Testimony of Jimmy Joseph) (Trial Transcript, Day 5, p. 1000–03); R. Doc. 665 at 113 (Testimony of Aaron Rudolph) (Trial Transcript, Day 5, p. 1051); R. Doc. 666 at 97–99 (Testimony of Andrealie Lewis) (Trial Transcript, Day 6, p. 1172–74).

[119] R. Doc. 666 at 235–39 (Testimony of Jamal Holmes) (Trial Transcript, Day 6, p. 1310–14).

[120] R. Doc. 666 at 239 (Testimony of Jamal Holmes) (Trial Transcript, Day 6, p. 1314).

[121] R. Doc. 662 at 50–51 (Testimony of Perry Hall) (Trial Transcript, Day 2, p, 244–45).

from the murder of Travis Arnold and shooting of Isaac Rowel, which occurred on February 24, 2010, in New Orleans. The crux of Byron's argument in seeking a new trial on these counts is that the Court "committed error in not instructing the jury on the definition of accessory after the fact under Louisiana law," given that the Government offered evidence of Byron's state-court guilty plea to that offense at the instant federal trial. [122] According to Byron, he was "prejudiced by the Court's refusal to give the instruction because the jury was not apprised as to what he admitted to being" when he pleaded guilty in state court to being an accessory after the fact to the murder of Travis Arnold.[123] Implicit in Byron's argument is that the jury did not understand the meaning or significance of Byron's guilty plea to that charge in state court, equating his accessory-after-the-fact guilty plea as evidence that Byron was guilty as a "principal" to Arnold's murder and Rowel's shooting under Louisiana law. Byron contends the jury, based on its misunderstanding of his state-court guilty plea, found Byron guilty as a "principal" to the crimes charged in Counts 5, 6, 7, and 8.

A.  Legal Standards

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[124] "The power to grant a new trial should be exercised infrequently by district courts, unless warranted by exceptional circumstances."[125] As such, motions for new trial must be "based either on the grounds that the verdict was against the great weight of the evidence or that some error was committed by the court or the prosecution which

---

[122] R. Doc. 540-1 at 7.
[123] R. Doc. 540-1 at 8.
[124] FED. R. CRIM. P. 33(a).
[125] *United States v. Abdallah*, 629 F. Supp. 2d 699, 731 (S.D. Tex. 2009) (quoting *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal quotation marks and citations omitted)).

substantially affect[ed] the rights of the accused."[126] An error substantially affects the rights of the accused if "it affected the outcome of the trial court proceedings."[127]

When the alleged error is the trial court's refusal or omission to give a particular jury instruction, the error is subjected to a harmless-error analysis.[128] "Harmless-error review looks . . . to the basis on which 'the jury actually rested its verdict.'"[129] "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."[130]

B.   Law & Analysis

   1.   *Counts 6 & 8*

Counts 6 and 8 charged Byron, respectively, with causing death through the use of a firearm, in violation of 18 U.S.C. § 924(j), and the use of a firearm during and in relation to a crime of violence and drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).[131] Counts 6 and 8 are not based on Louisiana law. Nor do Byron's convictions on Counts 6

---

[126] *United States v. Mix*, No. 12-171, 2014 WL 2625034, at *1 (E.D. La. June 12, 2014) (quoting *United States v. Simms*, 508 F. Supp. 1188, 1202 (W.D. La. 1980)).

[127] *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001). *See also United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005); *United States v. Kuyrkendall*, No. 3:09cr18-DPJ-LRA, 2009 WL 3230864, at *1 (S.D. Miss. Oct. 2, 2009)) ("A trial court's error in charging a jury is an error subject to harmless-error analysis.").

[128] *See, e.g., Copeland v. Tanner*, No. 12-1801, 2013 WL 3776344, at *9–10 (E.D. La. July 15, 2013) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)) ("A trial court's error in charging a jury is an error subject to harmless-error analysis."). The United States Supreme Court explained, in *Sullivan v. Louisiana*, that:

> In *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 705 (1967), we rejected the view that all federal constitutional errors in the course of a criminal trial require reversal. We held that the Fifth Amendment violation of prosecutorial comment upon the defendant's failure to testify would not require reversal of the conviction if the State could show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S. Ct., at 828. The *Chapman* standard recognizes that "certain constitutional errors, no less than other errors, may have been 'harmless' in terms of the factfinding process at trial." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986).

*Sullivan v. Louisiana*, 508 U.S. 275, 278–79 (1993).

[129] *Sullivan*, 508 U.S. at 279 (quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991)) (emphasis added).

[130] *Id.* (emphasis added).

[131] *See* R. Doc. 1 at 16 (Indictment) (Count 6); R. Doc. 1 at 17 (Indictment) (Count 8).

and 8 turn on or involve in any way the manner in which Louisiana law defines "accessory after the fact" or "principal." With respect to Counts 6 and 8, Byron's convictions were not based on a finding that he was a "principal" to those crimes under Louisiana law.[132]  In fact, whether Byron was a "principal" to Arnold's murder and Rowel's shooting under Louisiana law is entirely irrelevant to Counts 6 and 8 and had no bearing on Byron's convictions on those counts. Instead, his convictions were based either on his actions or those of his co-conspirators or agents. Therefore, Byron's argument that the jury did not understand or misinterpreted his accessory-after-the-fact guilty plea and, as a result, equated evidence of that plea as proof that he was a "principal" to the crimes charged in Counts 6 and 8 is unavailing. Because the requested instruction was irrelevant to Counts 6 and 8, any error committed by the Court in refusing to give the accessory-after-the fact instruction was harmless with respect to those counts.

## 2. *Counts 5 & 7*

Counts 5 and 7 require a different analysis. Count 5 charged Byron with the murder of Travis Arnold, in violation Title 14, Louisiana Revised Statutes, Sections 30.1(A)(1) and 24; all in violation of 18 U.S.C. §§ 1959(a)(1) and 2.[133] Count 7 charged Byron with assault with a dangerous weapon, in violation of Title 14, Louisiana Revised Statutes, Sections 37 and 24; all in violation of 18 U.S.C. §§ 1959(a)(3) and 2.[134] Unlike Counts 6 and 8, convictions on Counts 5 and 7 may have been based on a finding that Byron committed the charged crimes in violation of Louisiana law.[135] It is possible that Byron was convicted

---

[132] *See* R. Doc. 1 at 16 (Indictment) (Count 6); R. Doc. 1 at 17 (Indictment) (Count 8).

[133] R. Doc. 1 at 15–16 (Indictment) (Count 5).

[134] R. Doc. 1 at 16–17 (Indictment) (Count 7).

[135] *See* R. Doc. 1 at 15–16 (Indictment) (Count 5) ("On or about February 24, 2010, in the Eastern District of Louisiana, for the purpose of gaining entrance to and maintaining and increasing position in ROD, an enterprise engaged in racketeering activity, the defendants, **BYRON JONES**, a/k/a "Big Baby," and **SIDNEY PATTERSON** a/k/a "Duda Man," and others known and unknown to the Grand Jury, did

on Counts 5 and 7 because the jury concluded that, under Louisiana law, Byron was a "principal" to the Arnold murder and Rowel shooting. Therefore, whether the jury misunderstood or misinterpreted Byron's state-court guilty plea to being an accessory after the fact under Louisiana law in deciding whether Byron was a "principal" to those crimes may have affected his substantial rights if it affected the outcome of the trial court proceedings. It is in this context that the Court must consider whether its decision to not give the instruction warrants a new trial.

A court in this district recently confronted a similar issue in *Copeland v. Tanner*.[136] In that case, Walter Copeland, a state prisoner housed at the B.B. Rayburn Correctional Center in Angie, Louisiana, filed a federal petition for habeas corpus relief in the Eastern District of Louisiana.[137] Copeland sought federal review of his manslaughter conviction in Louisiana state court.[138] Copeland was charged in state court with being a principal to second-degree murder, but Copeland was ultimately convicted of the lesser-included offense of manslaughter.[139] In his federal proceeding, Copeland argued he was wrongfully convicted of manslaughter, in part, because the trial court did not instruct the jury on the definition of accessory after the fact under Louisiana law.[140] Copeland was not charged with being an accessory after the fact, but Copeland believed, had the jury been instructed

---

murder Travis Arnold, *in violation of the laws of the State of Louisiana, that is Title 14, Louisiana Revised Statutes, Section 30.1(A)(1) and 24*; all in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.") (emphasis added); *see also* R. Doc. 1 at 16–17 (Indictment) (Count 7) ("On or about February 24, 2010, in the Eastern District of Louisiana, for the purpose of gaining entrance to and maintaining and increasing position in ROD, an enterprise engaged in racketeering activity, the defendants, **BYRON JONES**, a/k/a "Big Baby," and **SIDNEY PATTERSON** a/k/a "Duda Man," and others known and unknown to the Grand Jury, did commit an assault with a dangerous weapon upon I.R., *in violation of the laws of the State of Louisiana, that is Title 14, Louisiana Revised Statutes, Sections 37 and 24*; all in violation of Title 18, United States Code, Sections 1959(a)(3) and 2.") (emphasis added).

[136] *Copeland v. Tanner*, No. 12-2801, 2013 WL 3776344 (E.D. La. July 15, 2013).
[137] *Id.* at *2–3.
[138] *Id.*
[139] *State v. Copeland*, No. 2007-2551, 2008 WL 5377642, at *4–5 (La. App. 1 Cir. Dec. 23, 2008).
[140] *Copeland v. Tanner*, No. 12-2801, 2013 WL 3776344, at *9 (E.D. La. July 15, 2013).

on the accessory-after-the-fact definition, the jury would have concluded he was guilty only of that offense, which would have required the jury to return not guilty verdicts on the offenses of second-degree murder and manslaughter.[141] On direct appeal of Copeland's manslaughter conviction, the state appellate court engaged in a harmless-error analysis, first noting that the trial court _did_ commit an error by failing to instruct the jury on the definition of accessory after the fact under Louisiana law.[142] The state appellate court concluded:

> [A]lthough accessory after the fact is not a verdict responsive to a charge of second degree murder, . . . there is some evidence in the record . . . from which a jury could have reasonably inferred the defendant to be guilty of the offense of accessory after the fact and not of being a principal to the killing. As such, the trial court was obligated to instruct the jury as to the law applicable to this theory of the defense.[143]

Nevertheless, the trial court's error was found to be harmless.[144] The state appellate court found that the "record reflect[ed] there was sufficient discussion at trial, without the special jury charge, to inform the jury that if it believed defendant was only guilty of being an accessory after the fact, it should return a verdict of not guilty" on the charged crime of second-degree murder and the lesser included offense of manslaughter.[145] It was noted that, "[d]uring opening and closing arguments, defense counsel _repeatedly_ advised the jury that, if anything, the defendant was guilty of the offense of accessory after the fact."[146] As a result, the state appellate court concluded: "[T]he guilty verdict in this case was obviously based upon a finding that defendant was involved in the commission of the offense as a principal and was surely unattributable to

---

[141] _Id._

[142] _State v. Copeland_, No. 2007-2551, 2008 WL 5377642, at *5 (La. App. 1 Cir. Dec. 23, 2008).

[143] _Id._

[144] _Id._

[145] _Id._

[146] _Id._ (emphasis added).

the omission of the accessory after the fact instruction."[147] On federal habeas review, a court in the Eastern District of Louisiana largely agreed with the state appellate court, finding any error committed in failing to instruct the jury on the definition of accessory after the fact under Louisiana law to be harmless.[148] The federal court noted:

> In both his opening and closing arguments, defense counsel emphatically stated that Copeland was guilty of nothing more than being an accessory after the fact. . . . Counsel repeatedly informed jurors of the definition of accessory after the fact, admitted that his client was guilty of being an accessory after the fact, and explained that because a finding of guilt on the charge of accessory after the fact was not an option, they must return a verdict of not guilty.[149]

In denying Copeland's petition for habeas corpus relief, the federal district court found that "the jury was well aware of petitioner's defense theory that he was guilty only as an accessory after the fact, rather than guilty of being a principal to murder or any other lesser included offense with which it was presented."[150] As a result, the court concluded that the "guilty verdict rendered by the jury was surely unattributable to the trial court's error, which must be viewed as harmless."[151]

*Copeland* is analogous to the instant case. In *Copeland*, the state appellate court concluded, first, that the trial court committed an error by not instructing the jury on the definition of accessory after the fact under Louisiana law.[152] The *Copeland* court reached that conclusion, despite the fact that the defendant was not charged with being an accessory after the fact, because there was "evidence in the record . . . from which a jury could have reasonably inferred the defendant to be guilty of the offense of accessory after

---

[147] *Id.*
[148] *Copeland v. Tanner*, No. 12-2801, 2013 WL 3776344, at *10–11 (E.D. La. July 15, 2013).
[149] *Id.*
[150] *Id.* at *11.
[151] *Id.*
[152] *State v. Copeland*, No. 2007-2551, 2008 WL 5377642, at *5 (La. App. 1 Cir. Dec. 23, 2008).

the fact and not of being a principal to the killing."[153] This Court finds *Copeland*'s reasoning to be persuasive and, therefore, reaches the same conclusion. The Government introduced an authenticated copy of Byron's state-court guilty plea to being an accessory after the fact, and it is possible that the jury inferred Byron was guilty only of that offense, and not of being a principal to murder under Louisiana law. For that reason, the Court should have instructed the jury on the definition of accessory after the fact under Louisiana law. Its failure to do so was an error.

Nevertheless, even if the Court did commit an error in not giving the accessory-after-the-fact instruction, the error was harmless. Byron contends he was prejudiced by the Court's refusal to give the requested instruction because it allowed the jury to misinterpret evidence of his state-court, accessory-after-the-fact guilty plea as proof that he was guilty as a principal.[154] During trial the Government did introduce an authenticated copy of Byron's state-court guilty plea to being an accessory after the fact to the murder of Travis Arnold.[155] Despite Byron's accessory-after-the-fact guilty plea being evidence of record, the Court finds that Byron was not prejudiced by the lack of a jury instruction on the definition of accessory after the fact under Louisiana law. As in *Copeland*, the attorneys in this case repeatedly explained to the jury the distinction between Byron's state-court, accessory-after-the-fact guilty plea and the fact that Byron was charged with being a principal under Louisiana law in the federal crimes for which he was on trial.[156] For example, during opening statements, Byron's attorney explained

---

[153] *Id.*

[154] *See* R. Doc. 540-1 at 8.

[155] Government Exh. 15. The specific piece of evidence introduced was, in fact, a self-authenticating copy of Byron's accessory-after-the-fact guilty plea in Louisiana state court. *See* R. Doc. 663 at 61 (Trial Transcript, Day 3, p. 470); Government Exh. 15.

[156] *See* R. Doc. 662 at 18–19 (Trial Transcript, Day 2, p. 212–13); R. Doc. 668 at 83 (Trial Transcript, Day 8, p. 1700); R. Doc. 668 at 43 (Trial Transcript, Day 8, p. 1660).

that the offense of accessory after the fact is "a horse of a different color" from being charged as a principal, as the elements of proof are different.[157] Later during his closing argument, Byron's attorney revisited the issue, explaining that Byron was charged in state court with being an accessory after the fact because the Government "could not prove that he had the specific intent to [kill] or inflict great bodily harm, which is a necessary element of the crime of murder in Louisiana."[158] This statement underscored, in the presence of the jury, the fact that Byron's accessory-after-the-fact guilty plea was not equivalent to a finding that Byron was a principal under Louisiana law with respect to the federal crimes charged in Counts 5 and 7. Moreover, as further evidence that the distinction was sufficiently fleshed out before the jury, the Government also weighed in on the difference between an "accessory after the fact" and a "principal" during its closing argument. Specifically, the Government, in discussing the evidence introduced with respect to the murder of Travis Arnold, stated:

> The other evidence you have in the murder of Travis Arnold, you have a conviction document. That's evidence. Mr. Jones pleaded guilty in state court to accessory after the fact in relation to the Travis Arnold shooting. And now, what they charged in state court, what the defendant pled guilty to, what the state prosecutor decided to do, that doesn't matter here. It's of no moment in terms of whether or not you should find the defendant guilty in this case. The reason it makes a difference is the defendant himself by this guilty plea puts himself at the scene of the Travis Arnold murder.[159]

Counts 5 and 7 dealt with whether Byron was a "principal" to the charged crimes under Title 14, Louisiana Revised Statutes, Section 24.[160] Byron was not charged with being an accessory after the fact to those crimes. It is clear from the record that, although the Court did not instruct the jury on the definition of accessory after the fact under

---

[157] R. Doc. 662 at 18–19 (Trial Transcript, Day 2, p. 212–13).
[158] R. Doc. 668 at 83 (Trial Transcript, Day 8, p. 1700).
[159] R. Doc. 668 at 43 (Trial Transcript, Day 8, p. 1660).
[160] *See* R. Doc. 1 at 15–16 (Indictment) (Count 5); R. Doc. 1 at 16–17 (Indictment) (Count 7).

Louisiana law, the jury was well aware of the significance and meaning of Byron's guilty plea to that offense in state court and how being an accessory after the fact is different from being a principal. Though failure to give the instruction was an error, the Court finds that the error did not substantially affect Byron's rights because it did not substantially affect the outcome of the trial. The guilty verdicts rendered against Byron on Counts 5 and 7 were surely unattributable to the Court's error, and a new trial on Counts 5 and 7 is, as a result, not warranted.

### 3.  *Counts 5 & 7—Further Considerations*

Byron's convictions on Counts 5 and 7 may have derived from co-conspirator liability, rather than a finding that Byron was a principal to the crimes charged therein. If so, Byron's convictions on Counts 5 and 7 were surely unattributable to any error in not instructing the jury on the definition of accessory after the fact under Louisiana law. This serves merely as another basis upon which to conclude that any error was harmless.

Counts 5 and 7 charged Byron with federal crimes for which he could be proven guilty based on the conduct of other co-conspirators. [161] Under the theory of co-conspirator liability, it was not necessary for the Government to prove that Byron, himself, committed the crimes charged in Counts 5 and 7 or that he was a principal to the crimes. The Court correctly instructed the jury that, if found guilty of the conspiracy charged in Count 1, Byron could also be found guilty on Counts 5 and 7 if "other conspirators committed the offenses" in those counts and if Byron was "charged in those counts, even though [Byron] may not have participated in any of the acts which constitute the offenses described."[162] Byron was found guilty of the conspiracy charged in Count 1.

---

[161] *See* R. Doc. 538 at 30 (Final Jury Instructions).
[162] R. Doc. 538 at 30 (Final Jury Instructions).

Therefore, as detailed above, Byron's convictions on Counts 5 and 7 may have been based on the fact that other co-conspirators committed the crimes charged in those counts. To the extent Byron was convicted of Counts 5 and 7 on the basis of co-conspirator liability, the fact the jury was not instructed on the accessory-after-the-fact definition would be entirely irrelevant. As a result, assuming Byron was convicted on Counts 5 and 7 on the basis of co-conspirator liability, his convictions were surely unattributable to any error committed by the Court in failing to instruct the jury on the definition of accessory after the fact under Louisiana law, and the error was harmless.

## **CONCLUSION**

For the foregoing reasons, Defendant Byron Jones's motion for a post-verdict judgment of acquittal and a new trial be and hereby is **DENIED**.

**New Orleans, Louisiana, this 6th day of April, 2016.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**